## SCHAPIRO et al. v. TWEEDIE FOOT WEAR CORPORATION.

No. 8039.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 19, 1942.

Decided Nov. 20, 1942.

Nathan M. Katz, of Pittsburgh, Pa., for appellants.

Frank W. Stonecipher, of Pittsburgh, Pa. (Stonecipher & Ralston, of Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, JONES, and GOOD-RICH, Circuit Judges.

GOODRICH, Circuit Judge.

On October 5, 1940, appellants, trading as a partnership, filed a voluntary petition in bankruptcy. The appellee, Tweedie Footwear Corporation, a creditor of the bankrupts, entered timely objections to the granting of a discharge to the latter alleging that they had obtained merchandise on credit from the appellee by submitting to it financial statements which were materially false in that they failed to disclose two debts owed to relatives. This charge if established is a sufficient basis for the court under § 14, sub. c(3) of the Bankruptcy Act to deny a discharge to the bankrupts.[1] The referee held a hearing and, after making findings of fact, sustained the creditors' objections. The District Court affirmed his action.

The referee's conclusion cannot be sustained in view of certain of his express findings of fact which are clear and unequivocal. On December 31, 1939 the bankrupts owed the appellee $1,223.70. On January 16, 1940 the bankrupts mailed a financial statement to the creditor. It disclosed under "Liabilities" $1,000 as "Payable to relatives, etc." and had on it the notation that "Personal loans are long term." The creditor received this statement on January 18, 1940. The referee further found that "Later in that day, [January 16, 1940] bankrupts borrowed from Mrs. Gladys F. Schapiro, wife of Alfred Schapiro, * * *, $500 and gave her a note dated January 16, 1940 for that amount." On February 20, 1940 the appellee's credit manager, who it was found, "handled" the account of the bankrupts from January 15, 1940, visited the bankrupts' place of business to determine whether further credit should be allowed. He was accompanied by a sales representative of the creditor. The findings of fact state that "At that visit, Mr. Miller [the credit manager] was shown and examined bankrupts' ledger which contained an account marked 'Union Savings Bank, guaranteed by Miriam Kopsofsky' [a cousin of one of the bankrupts] showing a credit entry in favor of Miss Kopsofsky for a note for $1,000 and

nothing paid on the principal. It also contained an account marked 'Gladys F. Schapiro' marked 'Loan notes' showing an entry in favor of Mrs. Schapiro of a note for $500 dated January 16, 1940. At that visit Mr. Schapiro told Mr. Miller that these entries were personal notes made to bankrupts by relatives, * * *. Mr. Miller at that visit discussed the Schapiro loan with Mr. Kay also." (Finding of Fact, No. 7.) In his next finding the referee states that "During the above mentioned visit * * *, Mr. Miller asked Mr. Schapiro to send the objecting creditor monthly statements. Mr. Schapiro replied that it would be an awful lot of work for Mr. Kay and himself and Mr. Miller then said that the only thing he wanted bankrupts to send him 'is an operating expense, your merchandise creditors and your balance sheet'. Mr. Schapiro asked him 'How about the note entries' and Mr. Miller replied that he knew about them and asked that bankrupts just show their merchandise creditors on their monthly report. At the same visit Mr. Miller explained to Mr. Kay that he wanted the operating expense report to see if bankrupts were making money, that he wanted to know if the business was paying, that he knew the financial condition of the bankrupts." (Finding of Fact, No. 8.) Thereafter the bankrupts submitted to the creditor monthly statements commencing with one dated March 31, 1940, which reviewed the financial condition of the business for the preceding three months and ending with one for the month of July, 1940. In none of these did the indebtednesses to relatives appear either under the "Liabilities" column or in the "Net Worth" statement. Meanwhile, the creditor had shipped merchandise on credit to the bankrupts, the first shipment being after March 1, 1940. In his final finding the referee states that "It is inferred * * * that bankrupts obtained the goods shipped after April 10, 1940 * * * on credit by making and publishing materially false statements in writing respecting their financial condition."

The ultimate facts required to make § 14, sub. c(3) operative must be inferred in most instances by the trier from objective facts found since they involve a

---

[1] "The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition; * * * ." 11 U.S. C.A. § 32, sub. c(3).

conclusion as to the state of mind of the maker of a representation. Unless "clearly erroneous" the conclusion is not to be set aside by a court on appeal.[2] In this case, the ultimate finding, admittedly an inference, was precluded by the other findings of fact and is clearly erroneous.

■ In order for a court to deny a discharge under § 14, sub. c(3) to a bankrupt, it must find that the statement made or published was "false." In this use of the word, " 'false' means more than erroneous or untrue and imports an intention to deceive, * * *." 1 Collier on Bankruptcy, 14th Ed. 1940, § 14.40. If the statement is neither erroneous nor untrue, there is obviously no need for further inquiry for § 14, sub. c(3), by definition, is inapplicable. That is the case here.

■ It is clear from Findings of Fact, numbered 7 and 8, made by the referee, that the creditor knew of the two debts owed by the bankrupts to their relatives. It is equally clear from these findings that the creditor expressly arranged with the bankrupts that the monthly statements were not to include these debts but were to list merchandise creditors only. This arrangement the bankrupts followed. In the absence of any evidence showing a revocation of the agreement, it cannot be said that a statement which complied with it was either erroneous or untrue as to the creditor requesting it.

The only possible justification for the referee's conclusion is his thesis that since the financial statements furnished after the visit of the creditor manager on February 20, 1940 omitted the two debts in the statement of liabilities and net worth, the creditor could believe the debts had been extinguished. In this respect, the referee, although conceding that there was no testimony to substantiate this hypothesis,[3] maintained that there was "No good reason for omitting the debts to relatives from the monthly showing of net worth. * * *" But, the referee's own findings of fact, already shown, establish beyond doubt that the arrangement between the creditor and the bankrupts called for the very course of conduct followed by the latter.

The referee apparently determined the truthfulness of the statements by the standard of what one without the knowledge of the creditor, as shown in Findings of Fact, numbered 7 and 8, might well have believed. But § 14, sub. c(3) is not to apply in vacuuo. The bankrupts must have "obtained money or property on credit, * * *" by publishing or making the false statement. Here, the specifications of objections to discharge disclose that the only one to whom the statements were shown or furnished and from whom credit was obtained was the objecting creditor, its credit manager handling the account. And he was the one who, as expressly found, proposed this form of statement in the first place.

The order denying the bankrupts' petition for discharge is reversed and the cause remanded for proceedings in accordance with this opinion.

---

[2] Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c; General Order in Bankruptcy, No. 47, 11 U.S.C.A. following section 53.

[3] The position apparently taken by the creditor, was that it never entered nor acceded to the arrangement of February 20, and therefore did not know of it. Furthermore, the credit manager denied that he examined the bankrupts' books on that date. The referee, however, concluded that his testimony should "be given no weight." Apparently, the testimony of bankrupts was accepted since he remarked that it "indicated sincerity" and "supports the findings in paragraphs 7 and 8 supra."